**KRONENBERGER BURGOYNE, LLP**
Karl S. Kronenberger (Cal. Bar No. 226112)
Deepa Krishnan (Cal. Bar No. 228664)
150 Post Street, Suite 520
San Francisco, CA 94108
Telephone: (415) 955-1155
Facsimile: (415) 955-1158
karl@kronenbergerlaw.com
deepa@kronenbergerlaw.com

**Attorneys for Plaintiff**
Quick Learning, LLC
a Texas Limited Liability Company

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

<table>
<tr><td>

**Quick Learning, LLC,** a Texas Limited Liability Company,

    Plaintiff,

    vs.

**QUICKLEARNING.COM, an Internet domain name**,

    Defendant.

</td><td>

Case No. C-07-06456-MHP

**DECLARATION OF KARL S. KRONENBERGER IN SUPPORT OF SUPPLEMENTAL BRIEFING IN RESPONSE TO COURT'S ORDER OF APRIL 30, 2008 REGARDING APPLICATION FOR DEFAULT JUDGMENT**

</td></tr>
</table>

## DECLARATION OF KARL S. KRONENBERGER

I, Karl S. Kronenberger, declare as follows:

1.    I am a partner at the firm Kronenberger Burgoyne, LLP, counsel to Plaintiff Quick Learning, LLC ("Quick Learning") in this action.  Except as otherwise noted, I have personal knowledge of the facts stated herein and could and would competently testify thereto.

2.    Plaintiff has filed applications with the U.S. Patent & Trademark Office (USPTO) for two trademarks that contain the words, "Quick Learning," and both such applications have registered.  The registrations (USPTO Reg. Nos. 2481381 and 2491822) are reflected in certificates provided by the USPTO, which are attached as Exhibit A hereto.  The trademarks were initially registered in the name of the Quick Learning founder, and thereafter were assigned to Quick Learning, LLC.  These two registrations are also reflected on the online USPTO database, which I printed from the website and attached as Exhibit B hereto.  The printouts from the USPTO database reflect the assignment to Quick Learning, LLC.

3.    The official domain name registry for ".com" domains is VeriSign, Inc., which is reflected in the ".Com Registry Agreement" between the Internet Corporation for Assigned Names and Numbers ("ICANN") and VeriSign, Inc., which I printed from the ICANN.org website and attached hereto at Exhibit C.  The Verisign registry contains the definitive directory that associates registered domain .com and .net domain names with the corresponding IP numbers of their respective domain name servers.  Verisign derives its authority as the official .com and .net registry from a contract with the nonprofit Internet Corporation for Assigned Names and Numbers ("ICANN"), which overseas Internet operations on behalf of the US Government.  As the official registry, Verisign has ultimate authority and control over the ownership and registration of .com and .net domain names.

4.    The registry for the Domain Name, Verisign, Inc., is clearly located in

KRONENBERGER BURGOYNE, LLP
150 Post Street, Suite 520
San Francisco, CA 94108
www.KronenbergerLaw.com

1  Mountain View, California, as evidenced by data on the California Secretary of State's

2  website, attached hereto as Exhibit D.  Verisign also states on its own website that it is

3  located in Mountain View, California, and a print-out of this page from the Verisign

4  website is attached hereto as Exhibit E.

5

6      I declare under penalty of perjury under the laws of the United States of America

7  that the foregoing is true and correct and that this Declaration was executed on May 29,

8  2008, in San Francisco, CA.

9                                             /s/
                                    _____
10                                     Karl S. Kronenberger

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KRONENBERGER BURGOYNE, LLP
150 Post Street, Suite 520
San Francisco, CA 94108
www.KronenbergerLaw.com

Exhibit A



## The United States of America

## CERTIFICATE OF REGISTRATION
### PRINCIPAL REGISTER

*The Mark shown in this certificate has been registered in the United States Patent and Trademark Office to the named registrant.*

*The records of the United States Patent and Trademark Office show that an application for registration of the Mark shown in this Certificate was filed in the Office; that the application was examined and determined to be in compliance with the requirements of the law and with the regulations prescribed by the Director of the United States Patent and Trademark Office; and that the Applicant is entitled to registration of the Mark under the Trademark Act of 1946, as Amended.*

*A copy of the Mark and pertinent data from the application are part of this certificate.*

*This registration shall remain in force for TEN (10) years, unless terminated earlier as provided by law, and subject to compliance with the provisions of Section 8 of the Trademark Act of 1946, as Amended.*



*Nicholas P. Godici*

*Acting Director of the United States Patent and Trademark Office*

**Int. Cls.: 16 and 41**

**Prior U.S. Cls.: 2, 5, 22, 23, 29, 37, 38, 50, 100, 101 and 107**

## United States Patent and Trademark Office

**Reg. No. 2,491,822**
**Registered Sep. 25, 2001**

### TRADEMARK
### SERVICE MARK
### PRINCIPAL REGISTER



CHAPA, SERGIO ZUNIGA (MEXICO CITIZEN)
ANDRES MOLINA ENRIQUEZ #4231
VIADUCTO PIEDAD, MEXICO 08200

FOR: PRINTED PRODUCTS, NAMELY, BOOKS, PAPERS, STATIONERY, AND PRINTED INSTRUCTIONAL, EDUCATIONAL, EDUCATIONAL AND TEACHING MATERIALS FOR USE IN THE FIELD OF TEACHING LANGUAGES, IN CLASS 16 (U.S. CLS. 2, 5, 22, 23, 29, 37, 38 AND 50).

FIRST USE 10-15-1981; IN COMMERCE 4-21-1999.

FOR: EDUCATIONAL SERVICES, NAMELY, CONDUCTING SEMINARS, CLASSES, CONFERENCES, WORKSHOPS IN THE FIELD OF TEACHING LANGUAGES, IN CLASS 41 (U.S. CLS. 100, 101 AND 107).

FIRST USE 10-15-1981; IN COMMERCE 4-21-1999.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "QUICK LEARNING", APART FROM THE MARK AS SHOWN.

THE LINING IN THE DRAWING IS A FEATURE OF THE MARK AND IS NOT INTENDED TO INDICATE COLOR.

SER. NO. 75-729,328, FILED 6-11-1999.

SUSAN HAYASH, EXAMINING ATTORNEY

Int. Cl.: 35

Prior U.S. Cls.: 100, 101 and 102

**United States Patent and Trademark Office**

Reg. No. 2,481,381
Registered Aug. 28, 2001

## SERVICE MARK
### PRINCIPAL REGISTER

# QUICK LEARNING

CHAPA, SERGIO ZUNIGA (MEXICO CITIZEN)
ANDRES MOLINA ENRIQUEZ #4231
VIADUCTO PIEDAD 08200, MEXICO, D.F., MEXICO

   FOR: PREPARING AND PLACING ADVERTISE-
MENTS FOR OTHERS AND PUBLIC RELATIONS,
IN CLASS 35 (U.S. CLS. 100, 101 AND 102).

   OWNER OF MEXICO REG. NO. 361.355, DATED 4-
26-1989, EXPIRES 11-10-2003.

   SER. NO. 75-729,320, FILED 6-11-1999.

JOHN SNODGRASS, EXAMINING ATTORNEY

Exhibit B



**United States Patent and Trademark Office**
**Home|Site Index|Search|FAQ|Glossary|Guides|Contacts|eBusiness|eBiz alerts|News|Help**

## Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Thu May 29 04:10:37 EDT 2008*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP |

Logout  Please logout when you are done to release system resources allocated for you.

# Record 1 out of 1

| TARR Status | ASSIGN Status | TDR | TTAB Status |  *( Use the "Back" button of the Internet Browser to return to TESS)*

## Typed Drawing

| **Word Mark** | QUICK LEARNING |
| **Goods and Services** | IC 035. US 100 101 102. G & S: PREPARING AND PLACING ADVERTISEMENTS FOR OTHERS AND PUBLIC RELATIONS |
| **Mark Drawing Code** | (1) TYPED DRAWING |
| **Serial Number** | **75729320** |
| **Filing Date** | June 11, 1999 |
| **Current Filing Basis** | 44E |
| **Original Filing Basis** | 1B |
| **Published for Opposition** | January 9, 2001 |
| **Registration Number** | 2481381 |
| **Registration Date** | August 28, 2001 |
| **Owner** | (REGISTRANT) CHAPA, SERGIO ZUNIGA INDIVIDUAL MEXICO Andres Molina Enriquez #4231 Viaducto Piedad 08200, Mexico, D.F. MEXICO |
| | (LAST LISTED OWNER) QUICK LEARNING, LLC LTD LIAB CO 12700 PARK CENTRAL DR., STE. 1450 DALLAS TEXAS 75251 |
| **Assignment Recorded** | ASSIGNMENT RECORDED |
| **Attorney of Record** | David S. Abrams |
| **Type of Mark** | SERVICE MARK |
| **Register** | PRINCIPAL |
| **Live/Dead Indicator** | LIVE |

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP |

Case 3:07-cv-06456-MHP    Document 20-2    Filed 05/30/2008    Page 7 of 34

| .**HOME** | **SITE INDEX** | **SEARCH** | *e*BUSINESS | **HELP** | **PRIVACY POLICY**



**United States Patent and Trademark Office**

**Home|Site Index|Search|FAQ|Glossary|Guides|Contacts|eBusiness|eBiz alerts|News|Help**

**Trademarks** > **Trademark Electronic Search System (TESS)**

*TESS was last updated on Thu May 29 04:10:37 EDT 2008*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP |

Logout    Please logout when you are done to release system resources allocated for you.

# Record 1 out of 1

| TARR Status | ASSIGN Status | TDR | TTAB Status | *( Use the "Back" button of the Internet Browser to return to TESS)*



| **Word Mark** | QUICK LEARNING |
|---|---|
| **Goods and Services** | IC 016. US 002 005 022 023 029 037 038 050. G & S: PRINTED PRODUCTS, NAMELY, BOOKS, PAPERS, STATIONERY, AND PRINTED INSTRUCTIONAL, EDUCATIONAL, EDUCATIONAL AND TEACHING MATERIALS FOR USE IN THE FIELD OF TEACHING LANGUAGES. FIRST USE: 19811015. FIRST USE IN COMMERCE: 19990421

IC 041. US 100 101 107. G & S: EDUCATIONAL SERVICES, NAMELY, CONDUCTING SEMINARS, CLASSES, CONFERENCES, WORKSHOPS IN THE FIELD OF TEACHING LANGUAGES. FIRST USE: 19811015. FIRST USE IN COMMERCE: 19990421 |
| **Mark Drawing Code** | (3) DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS |
| **Design Search Code** | 01.05.01 - Sun, rising or setting (partially exposed or partially obstructed); Sunrise
02.01.33 - Grotesque men formed by letters, numbers, punctuation or geometric shapes; Stick figures
02.03.26 - Grotesque women formed by letters, numbers, punctuation or geometric shapes
02.05.26 - Children - grotesque children formed by letters, numbers, punctuation or geometric shapes
02.07.26 - Groups, grotesque (having human features or attributes)
26.05.12 - Triangles with bars, bands and lines
26.05.13 - Triangles, exactly two triangles; Two triangles |
| **Serial Number** | **75729328** |
| **Filing Date** | June 11, 1999 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1B |
| **Published for Opposition** | July 3, 2001 |

| | |
|---|---|
| **Registration Number** | 2491822 |
| **Registration Date** | September 25, 2001 |
| **Owner** | (REGISTRANT) CHAPA, SERGIO ZUNIGA INDIVIDUAL MEXICO Andres Molina Enriquez #4231 Viaducto Piedad MEXICO 08200 |
| | (LAST LISTED OWNER) QUICK LEARNING, LLC LTD LIAB CO 12700 PARK CENTRAL DR., STE. 1450 DALLAS TEXAS 75251 |
| **Assignment Recorded** | ASSIGNMENT RECORDED |
| **Attorney of Record** | David S. Abrams |
| **Disclaimer** | NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "QUICK LEARNING" APART FROM THE MARK AS SHOWN |
| **Description of Mark** | The lining in the drawing is a feature of the mark and is not intended to indicate color. |
| **Type of Mark** | TRADEMARK. SERVICE MARK |
| **Register** | PRINCIPAL |
| **Affidavit Text** | SECT 15. SECT 8 (6-YR). |
| **Live/Dead Indicator** | LIVE |

TESS HOME    NEW USER    STRUCTURED    FREE FORM    BROWSE DICT    SEARCH OG    TOP    HELP

| .HOME | SITE INDEX | SEARCH | eBUSINESS | HELP | PRIVACY POLICY

Exhibit C



# .com Registry Agreement
### (1 March 2006)

---

# REGISTRY AGREEMENT

This REGISTRY AGREEMENT (this "Agreement") is entered into by and between the Internet Corporation for Assigned Names and Numbers, a California nonprofit public benefit corporation ("ICANN"), and VeriSign, Inc. a Delaware corporation.

WHEREAS, the parties wish to work together cooperatively to promote and facilitate the security and stability of the Internet and the DNS, and to that end, hereby agree as follows:

### ARTICLE I  Introduction

Section 1.1    Effective Date.  The effective date ("Effective Date") for purposes of this Agreement shall be March 1, 2006.

Section 1.2    Top-Level Domain.  The Top-Level Domain to which this Agreement applies is .com ("TLD").

Section 1.3    Designation as Registry Operator.  Upon the Effective Date, until the Expiration Date as defined in Section 4.1 hereof, ICANN shall continue to recognize VeriSign, Inc. as the sole registry operator for the TLD ("Registry Operator").

### ARTICLE II  Representations and Warranties

Section 2.1    Registry Operator's Representations and Warranties.

    (a)    Organization; Due Authorization and Execution.  Registry Operator is a corporation, duly organized, validly existing and in good standing under the laws of Delaware, and Registry Operator has all requisite power and authority to enter into this Agreement.  All corporate approvals and actions necessary for the entrance by Registry Operator into this Agreement have been obtained and this Agreement has been duly and validly executed and delivered by Registry Operator.

    (b)    Statements made During Negotiation Process.  The factual statements made in writing by Registry Operator in negotiating this Agreement were true and correct in all material respects at the time made.  A violation or breach of any such representation or warranty shall not be a basis for termination, rescission or other equitable relief, and, instead shall only give rise to a claim for damages.

Section 2.2    ICANN's Representations and Warranties.

    (a)    Organization; Due Authorization and Execution.  ICANN is a nonprofit

public benefit corporation duly organized, validly existing and in good standing under the laws of California. ICANN has all requisite corporate power and authority to enter into this Agreement. All corporate approvals and actions necessary for the entrance by ICANN into this Agreement have been obtained and this Agreement has been duly and validly executed and delivered by ICANN.

### ARTICLE III   Covenants

Section 3.1      Covenants of Registry Operator.  Registry Operator covenants and agrees with ICANN as follows:

(a)           Preserve Security and Stability.

(i)           ICANN Temporary Specifications or Policies.  Registry Operator shall comply with and implement all specifications or policies established by the ICANN Board of Directors on a temporary basis, if adopted by the ICANN Board of Directors by a vote of at least two-thirds of its members, so long as the ICANN Board of Directors reasonably determines that immediate temporary establishment of a specification or policy on the subject is necessary to maintain the Stability or Security (as defined in Section 3.1(d)(iv)(G)) of Registry Services or the DNS ("Temporary Specification or Policies").  Such proposed specification or policy shall be as narrowly tailored as feasible to achieve those objectives.  In establishing any specification or policy under this provision, the ICANN Board of Directors shall state the period of time for which the specification or policy is temporarily adopted and shall immediately implement the Consensus Policy development process set forth in ICANN's Bylaws.  ICANN shall also issue an advisory statement containing a detailed explanation of its reasons for adopting the temporary specification or policy and why the Board believes the specification or policy should receive the consensus support of Internet stakeholders. If the period of time for which the specification or policy is adopted exceeds 90 days, the ICANN Board shall reaffirm its temporary adoption every 90 days for a total period not to exceed one year, in order to maintain such policy in effect until such time as it shall become a Consensus Policy as described in Section 3.1(b) below.  If during such one year period, the temporary policy or specification does not become a Consensus Policy meeting the standard set forth in Section 3.1(b) below, Registry Operator shall no longer be required to comply with or implement such temporary policy or specification.

(b)           Consensus Policies.

(i)           At all times during the term of this Agreement and subject to the terms hereof, Registry Operator will fully comply with and implement all Consensus Policies found at http://www.icann.org/general/consensus-policies.htm, as of the Effective Date and as may in the future be developed and adopted in accordance with ICANN's Bylaws and as set forth below.

(ii)           "Consensus Policies" are those specifications or policies

established (1) pursuant to the procedure set forth in ICANN's Bylaws and due process, and (2) covering those topics listed in Section 3.1(b)(iv) below.  The Consensus Policy development process and procedure set forth in ICANN's Bylaws may be revised from time to time in accordance with ICANN's Bylaws, and any Consensus Policy that is adopted through such a revised process and covering those topics listed in Section 3.1(b)(iv) below shall be considered a Consensus Policy for purposes of this Agreement.

(iii)          For all purposes under this Agreement, the policies identified at http://www.icann.org/general/consensus-policies.htm shall be treated in the same manner and have the same effect as "Consensus Policies."

(iv)          Consensus Policies and the procedures by which they are developed shall be designed to produce, to the extent possible, a consensus of Internet stakeholders, including the operators of gTLDs. Consensus Policies shall relate to one or more of the following: (1) issues for which uniform or coordinated resolution is reasonably necessary to facilitate interoperability, Security and/or Stability of the Internet or DNS; (2) functional and performance specifications for the provision of Registry Services (as defined in Section 3.1(d)(iii) below); (3) Security and Stability of the registry database for the TLD; (4) registry policies reasonably necessary to implement Consensus Policies relating to registry operations or registrars; or (5) resolution of disputes regarding the registration of domain names (as opposed to the use of such domain names).  Such categories of issues referred to in the preceding sentence shall include, without limitation:

(A)          principles for allocation of registered names in the TLD (e.g., first-come, first-served, timely renewal, holding period after expiration);

(B)          prohibitions on warehousing of or speculation in domain names by registries or registrars;

(C)          reservation of registered names in the TLD that may not be registered initially or that may not be renewed due to reasons reasonably related to (a) avoidance of confusion among or misleading of users, (b) intellectual property, or (c) the technical management of the DNS or the Internet  (e.g., establishment of reservations of names from registration);

(D)          maintenance of and access to accurate and up-to-date information concerning domain name registrations;

(E)          procedures to avoid disruptions of domain name registration due to suspension or termination of operations by a registry operator or a registrar, including procedures for allocation of responsibility for serving

registered domain names in a TLD affected by such a suspension or termination; and

(F)          resolution of disputes regarding whether particular parties may register or maintain registration of particular domain names.

(v)          In addition to the other limitations on Consensus Policies, they shall not:

(A)          prescribe or limit the price of Registry Services;

(B)          modify the standards for the consideration of proposed Registry Services, including the definitions of Security and Stability (set forth below) and the standards applied by ICANN;

(C)          for two years following the Effective Date, modify the procedure for the consideration of proposed Registry Services;

(D)          modify the terms or conditions for the renewal or termination of this Agreement;

(E)          modify ICANN's obligations to Registry Operator under Section 3.2 (a), (b), and (c);

(F)          modify the limitations on Consensus Policies or Temporary Specifications or Policies;

(G)          modify the definition of Registry Services;

(H)          modify the terms of Sections 7.2 and 7.3, below; and

(I)          alter services that have been implemented pursuant to Section 3.1(d) of this Agreement (unless justified by compelling and just cause based on Security and Stability).

(vi)          Registry Operator shall be afforded a reasonable period of time following notice of the establishment of a Consensus Policy or Temporary Specifications or Policies in which to comply with such policy or specification, taking into account any urgency involved.

In the event of a conflict between Registry Services (as defined in Section 3.1(d)(iii) below), on the one hand, and Consensus Policies developed in accordance with this Section 3.1(b) or any Temporary Specifications or Policies established pursuant to Section 3.1(a)(i) above, on the other hand, the Consensus Polices or Temporary Specifications or Policies shall control, notwithstanding any other provisions contained within this Agreement.

(c)            <u>Handling of Registry Data</u>.

(i)         Data Escrow. Registry Operator shall establish at its expense a data escrow or mirror site policy for the Registry Data compiled by Registry Operator. Registry Data, as used in this Agreement, shall mean the following: (1) data for domains sponsored by all registrars, consisting of domain name, server name for each nameserver, registrar id, updated date, creation date, expiration date, status information, and DNSSEC-related key material; (2) data for nameservers sponsored by all registrars consisting of server name, each IP address, registrar id, updated date, creation date, expiration date, and status information; (3) data for registrars sponsoring registered domains and nameservers, consisting of registrar id, registrar address, registrar telephone number, registrar e-mail address, whois server, referral URL, updated date and the name, telephone number, and e-mail address of all the registrar's administrative, billing, and technical contacts; (4) domain name registrant data collected by the Registry Operator from registrars as part of or following registration of a domain name; and (5) the DNSSEC-related material necessary to sign the .com zone (e.g., public and private portions of .com zone key-signing keys and zone-signing keys). The escrow agent or mirror-site manager, and the obligations thereof, shall be mutually agreed upon by ICANN and Registry Operator on commercially reasonable standards that are technically and practically sufficient to allow a successor registry operator to assume management of the TLD. To this end, Registry Operator shall periodically deposit into escrow all Registry Data on a schedule (not more frequently than weekly for a complete set of Registry Data, and daily for incremental updates) and in an electronic format mutually approved from time to time by Registry Operator and ICANN, such approval not to be unreasonably withheld by either party. In addition, Registry Operator will deposit into escrow that data collected from registrars as part of offering Registry Services introduced after the Effective Date of this Agreement. The escrow shall be maintained, at Registry Operator's expense, by a reputable escrow agent mutually approved by Registry Operator and ICANN, such approval also not to be unreasonably withheld by either party. The schedule, content, format, and procedure for escrow deposits shall be as reasonably established by ICANN from time to time, and as set forth in Appendix 1 hereto. Changes to the schedule, content, format, and procedure may be made only with the mutual written consent of ICANN and Registry Operator (which neither party shall unreasonably withhold) or through the establishment of a Consensus Policy as outlined in Section 3.1(b) above. The escrow shall be held under an agreement, substantially in the form of Appendix 2, as the same may be revised from time to time, among ICANN, Registry Operator, and the escrow agent.

(ii)        Personal Data. Registry Operator shall notify registrars sponsoring registrations in the registry for the TLD of the purposes for which Personal Data (as defined below) submitted to Registry Operator by registrars, if any, is collected, the intended recipients (or categories of recipients) of such Personal Data, and the mechanism for access to

and correction of such Personal Data.  Registry Operator shall take reasonable steps to protect Personal Data from loss, misuse, unauthorized disclosure, alteration or destruction. Registry Operator shall not use or authorize the use of Personal Data in a way that is incompatible with the notice provided to registrars.  "Personal Data" shall refer to all data about any identified or identifiable natural person.

(iii)          Bulk Zone File Access.  Registry Operator shall provide bulk access to the zone files for the registry for the TLD to ICANN on a continuous basis in the manner ICANN may reasonably specify from time to time. Bulk access to the zone files shall be provided to third parties on the terms set forth in the TLD zone file access agreement reasonably established by ICANN, which initially shall be in the form attached as Appendix 3 hereto.  Changes to the zone file access agreement may be made upon the mutual written consent of ICANN and Registry Operator (which consent neither party shall unreasonably withhold).

(iv)          Monthly Reporting.  Within 20 days following the end of each calendar month, Registry Operator shall prepare and deliver to ICANN a report providing such data and in the format specified in Appendix 4.  ICANN may audit Registry Operator's books and records relating to data contained in monthly reports from time to time upon reasonable advance written notice, provided that such audits shall not exceed one per quarter.  Any such audit shall be at ICANN's cost, unless such audit shall reflect a material discrepancy or discrepancies in the data provided by Registry Operator.  In the latter event, Registry Operator shall reimburse ICANN for all costs and expenses associated with such audit, which reimbursement shall be paid together with the next Registry-Level Fee payment due following the date of transmittal of the cost statement for such audit.

(v)          Whois Service.  Registry Operator shall provide such whois data as set forth in Appendix 5.

(d)          Registry Operations.

(i)          Registration Restrictions.  Registry Operator shall reserve, and not register any TLD strings (i) appearing on the list of reserved TLD strings attached as Appendix 6 hereto or (ii) located at http://data.iana.org/TLD/tlds-alpha-by-domain.txt for initial (i.e., other than renewal) registration at the second level within the TLD.

(ii)          Functional and Performance Specifications.  Functional and Performance Specifications for operation of the TLD shall be as set forth in Appendix 7 hereto, and shall address without limitation DNS services; operation of the shared registration system; and nameserver operations. Registry Operator shall keep technical and operational records sufficient to evidence compliance with such specifications for at least one year, which records ICANN may audit from time to time upon reasonable advance written notice, provided that such audits shall not exceed one per quarter. Any such audit shall be at ICANN's

cost.

(iii)         Registry Services.  Registry Services are, for purposes of this Agreement, defined as the following: (a) those services that are both (i) operations of the registry critical to the following tasks:  the receipt of data from registrars concerning registrations of domain names and name servers; provision to registrars of status information relating to the zone servers for the TLD; dissemination of TLD zone files; operation of the registry zone servers; and dissemination of contact and other information concerning domain name server registrations in the TLD as required by this Agreement; and (ii) provided by the Registry Operator for the .com registry as of the Effective Date; (b) other products or services that the Registry Operator is required to provide because of the establishment of a Consensus Policy (as defined in Section 3.1(b) above); (c) any other products or services that only a registry operator is capable of providing, by reason of its designation as the registry operator; and (d) material changes to any Registry Service within the scope of (a), (b) or (c) above.  Only Registry Services defined in (a) and (b) above are subject to the maximum price provisions of Section 7.3, below.

(iv)         Process for Consideration of Proposed Registry Services.  Following written notification by Registry Operator to ICANN that Registry Operator may make a change in a Registry Service within the scope of the preceding paragraph:

(A)         ICANN shall have 15 calendar days to make a "preliminary determination" whether a Registry Service requires further consideration by ICANN because it reasonably determines such Registry Service:  (i) could raise significant Security or Stability issues or (ii) could raise significant competition issues.

(B)         Registry Operator must provide sufficient information at the time of notification to ICANN that it may implement such a proposed Registry Service to enable ICANN to make an informed "preliminary determination." Information provided by Registry Operator and marked "CONFIDENTIAL" shall be treated as confidential by ICANN.  Registry Operator will not designate "CONFIDENTIAL" information necessary to describe the purpose of the proposed Registry Service and the effect on users of the DNS.

(C)         ICANN may seek expert advice during the preliminary determination period (from entities or persons subject to confidentiality agreements) on the competition, Security or Stability implications of the Registry Service in order to make its "preliminary determination."  To the extent ICANN determines to disclose confidential information to any such experts, it will provide notice to Registry Operator of the identity of the expert(s) and the information it intends

to convey.

(D)        If ICANN determines during the 15 calendar day "preliminary determination" period that the proposed Registry Service, does not raise significant Security or Stability (as defined below), or competition issues, Registry Operator shall be free to deploy it upon such a determination.

(E)        In the event ICANN reasonably determines during the 15 calendar day "preliminary determination" period that the Registry Service might raise significant competition issues, ICANN shall refer the issue to the appropriate governmental competition authority or authorities with jurisdiction over the matter within five business days of making its determination, or two business days following the expiration of such 15 day period, whichever is earlier, with notice to Registry Operator.  Any such referral communication shall be posted on ICANN's website on the date of transmittal.  Following such referral, ICANN shall have no further responsibility, and Registry Operator shall have no further obligation to ICANN, with respect to any competition issues relating to the Registry Service.  If such a referral occurs, the Registry Operator will not deploy the Registry Service until 45 calendar days following the referral, unless earlier cleared by the referred governmental competition authority.

(F)        In the event that ICANN reasonably determines during the 15 calendar day "preliminary determination" period that the proposed Registry Service might raise significant Stability or Security issues (as defined below), ICANN will refer the proposal to a Standing Panel of experts (as defined below) within five business days of making its determination, or two business days following the expiration of such 15 day period, whichever is earlier, and simultaneously invite public comment on the proposal.  The Standing Panel shall have 45 calendar days from the referral to prepare a written report regarding the proposed Registry Service's effect on Security or Stability (as defined below), which report (along with a summary of any public comments) shall be forwarded to the ICANN Board.  The report shall set forward the opinions of the Standing Panel, including, but not limited to, a detailed statement of the analysis, reasons, and information upon which the panel has relied in reaching their conclusions, along with the response to any specific questions that were included in the referral from ICANN staff.  Upon ICANN's referral to the Standing Panel, Registry Operator may submit additional information or analyses regarding the likely effect on Security or Stability of the Registry Service.

(G)          Upon its evaluation of the proposed Registry Service, the Standing Panel will report on the likelihood and materiality of the proposed Registry Service's effects on Security or Stability, including whether the proposed Registry Service creates a reasonable risk of a meaningful adverse effect on Security or Stability as defined below:

Security: For purposes of this Agreement, an effect on security by the proposed Registry Service shall mean (1) the unauthorized disclosure, alteration, insertion or destruction of Registry Data, or (2) the unauthorized access to or disclosure of information or resources on the Internet by systems operating in accordance with all applicable standards.

Stability: For purposes of this Agreement, an effect on stability shall mean that the proposed Registry Service (1) is not compliant with applicable relevant standards that are authoritative and published by a well-established, recognized and authoritative standards body, such as relevant Standards-Track or Best Current Practice RFCs sponsored by the IETF or (2) creates a condition that adversely affects the throughput, response time, consistency or coherence of responses to Internet servers or end systems, operating in accordance with applicable relevant standards that are authoritative and published by a well-established, recognized and authoritative standards body, such as relevant Standards-Track or Best Current Practice RFCs and relying on Registry Operator's delegation information or provisioning services.

(H)          Following receipt of the Standing Panel's report, which will be posted (with appropriate confidentiality redactions made after consultation with Registry Operator) and available for public comment, the ICANN Board will have 30 calendar days to reach a decision.  In the event the ICANN Board reasonably determines that the proposed Registry Service creates a reasonable risk of a meaningful adverse effect on Stability or Security, Registry Operator will not offer the proposed Registry Service.  An unredacted version of the Standing Panel's report shall be provided to Registry Operator upon the posting of the report.  The Registry Operator may respond to the report of the Standing Panel or otherwise submit to the ICANN Board additional information or analyses regarding the likely effect on Security or Stability of the Registry Service.

(I)          The Standing Panel shall consist of a total of 20 persons expert in the design, management and implementation of the complex systems and standards-protocols utilized in the Internet infrastructure and DNS (the "Standing Panel").  The members of the

Standing Panel will be selected by its Chair.  The Chair of the Standing Panel will be a person who is agreeable to both ICANN and the registry constituency of the supporting organization then responsible for generic top level domain registry policies.  All members of the Standing Panel and the Chair shall execute an agreement requiring that they shall consider the issues before the panel neutrally and according to the definitions of Security and Stability.  For each matter referred to the Standing Panel, the Chair shall select no more than five members from the Standing Panel to evaluate the referred matter, none of which shall have an existing competitive, financial, or legal conflict of interest, and with due regard to the particular technical issues raised by the referral.

(e)        Fees and Payments.  Registry Operator shall pay the Registry-Level Fees to ICANN on a quarterly basis in accordance with Section 7.2 hereof.

(f)        Traffic Data.  Nothing in this Agreement shall preclude Registry Operator from making commercial use of, or collecting, traffic data regarding domain names or non-existent domain names for purposes such as, without limitation, the determination of the availability and health of the Internet, pinpointing specific points of failure, characterizing attacks and misconfigurations, identifying compromised networks and hosts, and promoting the sale of domain names; provided, however, that such use does not disclose domain name registrant, end user information or other Personal Data as defined in Section 3.1(c)(ii) for any purpose not otherwise authorized by this agreement.  The process for the introduction of new Registry Services shall not apply to such traffic data.  Nothing contained in this section 3.1(f) shall be deemed to constitute consent or acquiescence by ICANN to a re-introduction by Registry Operator of the SiteFinder service previously introduced by the Registry Operator on or about September 15, 2003, or the introduction of any substantially similar service employing a universal wildcard function intended to achieve the same or substantially similar effect as the SiteFinder service.  To the extent that traffic data subject to this provision is made available, access shall be on terms that are non-discriminatory.

(g)        Security and Stability Review.  Twice annually Registry Operator shall engage in discussions with executive staff of ICANN and the Chairman of the Board of ICANN on trends impacting the Security and/or Stability of the Registry, the DNS or the Internet pursuant to the terms of confidentiality agreements executed both by the executive staff of ICANN and the Chairman of the Board.

(h)        Centralized Whois.  Registry Operator shall develop and deploy a centralized Whois for the .com TLD if mandated by ICANN insofar as reasonably feasible, particularly in view of Registry Operator's dependence on cooperation of third parties.

Section 3.2        Covenants of ICANN.  ICANN covenants and agrees with Registry Operator as follows:

(a)        Open and Transparent.  Consistent with ICANN's expressed mission

and core values, ICANN shall operate in an open and transparent manner.

(b)        Equitable Treatment.  ICANN shall not apply standards, policies, procedures or practices arbitrarily, unjustifiably, or inequitably and shall not single out Registry Operator for disparate treatment unless justified by substantial and reasonable cause.

(c)        TLD Zone Servers.  In the event and to the extent that ICANN is authorized to set policy with regard to an authoritative root server system, it will ensure that (i) the authoritative root will point to the TLD zone servers designated by Registry Operator for the Registry TLD throughout the Term of this Agreement; and (ii) any changes to the TLD zone server designation submitted to ICANN by Registry Operator will be implemented by ICANN within seven days of submission.

(d)        Nameserver Changes.  Registry Operator may request changes in the nameserver delegation for the Registry TLD. Any such request must be made in a format, and otherwise meet technical requirements, specified from time to time by ICANN. ICANN will use commercially reasonable efforts to have such requests implemented in the Authoritative Root-Server System within seven calendar days of the submission.

(e)        Root-zone Information Publication.  ICANN's publication of root-zone contact information for the Registry TLD will include Registry Operator and its administrative and technical contacts.  Any request to modify the contact information for the Registry Operator must be made in the format specified from time to time by ICANN.

Section 3.3        Cooperation. The parties agree to cooperate with each other and share data as necessary to accomplish the terms of this Agreement.

## ARTICLE IV   Term of Agreement

Section 4.1        Term.  The initial term of this Agreement shall expire on November 30, 2012.  The "Expiration Date" shall be November 30, 2012, as extended by any renewal terms.

Section 4.2        Renewal.  This Agreement shall be renewed upon the expiration of the term set forth in Section 4.1 above and each later term, unless the following has occurred : (i) following notice of breach to Registry Operator in accordance with Section 6.1 and failure to cure such breach within the time period prescribed in Section 6.1, an arbitrator or court has determined that Registry Operator has been in fundamental and material breach of Registry Operator's obligations set forth in Sections 3.1(a), (b), (d) or (e); Section 5.2 or Section 7.3 and (ii) following the final decision of such arbitrator or court, Registry Operator has failed to comply within ten days with the decision of the arbitrator or court, or within such other time period as may be prescribed by the arbitrator or court.  Upon renewal, in the event that the terms of this Agreement are not similar to the terms generally in effect in the Registry Agreements of the 5 largest gTLDs (determined by the number of domain name registrations under management at the time of renewal), renewal shall be upon terms reasonably necessary to render the terms of this Agreement similar to such terms in the Registry Agreements for those other gTLDs.  The preceding sentence, however, shall not apply to the terms of this Agreement regarding the price of Registry Services; the standards for the consideration of proposed Registry Services, including the definitions of Security and Stability and the standards applied by ICANN in the consideration process; the terms or conditions for

the renewal or termination of this Agreement; ICANN's obligations to Registry Operator under Section 3.2 (a), (b), and (c); the limitations on Consensus Policies or Temporary Specifications or Policies; the definition of Registry Services; or the terms of Section 7.3.

Section 4.3    Failure to Perform in Good Faith.  In the event Registry Operator shall have been repeatedly and willfully in fundamental and material breach of Registry Operator's obligations set forth in Sections 3.1(a), (b), (d) or (e); Section 5.2 or Section 7.3, and arbitrators in accordance with Section 5.1(b) of this Agreement repeatedly have found Registry Operator to have been in fundamental and material breach of this Agreement, including in at least three separate awards, then the arbitrators shall award such punitive, exemplary or other damages as they may believe appropriate under the circumstances.

## ARTICLE V   Dispute Resolution

Section 5.1    Resolution of Disputes.

(a)    Cooperative Engagement.  In the event of a disagreement between Registry Operator and ICANN arising under or out of this Agreement, either party may by notice to the other invoke the dispute resolution provisions of this Article V.  Provided, however, that before either party may initiate arbitration as provided in Section 5.1(b) below, ICANN and Registry Operator must attempt to resolve the dispute by cooperative engagement as set forth in this Section 5.1(a).  If either party provides written notice to the other demanding cooperative engagement as set forth in this Section 5.1(a), then each party will, within seven calendar days after such written notice is deemed received in accordance with Section 8.6 hereof, designate a single executive officer as its representative under this Section 5.1(a) with full authority to act on such party's behalf to resolve the dispute.  The designated representatives shall, within 2 business days after being designated, confer by telephone or in person to attempt to resolve the dispute.  If they are not able to resolve the dispute during such telephone conference or meeting, they shall further meet in person at a location reasonably designated by ICANN within 7 calendar days after such initial telephone conference or meeting, at which meeting the parties shall attempt to reach a definitive resolution.  The time schedule and process set forth in this Section 5.1(a) may be modified with respect to any dispute, but only if both parties agree to a revised time schedule or process in writing in advance.  Settlement communications within the scope of this paragraph shall be inadmissible in any arbitration or litigation between the parties.

(b)    Arbitration.  Disputes arising under or in connection with this Agreement, including requests for specific performance, shall be resolved through binding arbitration conducted as provided in this Section 5.1(b) pursuant to the rules of the International Court of Arbitration of the International Chamber of Commerce ("ICC"). The arbitration shall be conducted in the English language and shall occur in Los Angeles County, California, USA only following the failure to resolve the dispute pursuant to cooperative engagement discussions as set forth in Section 5.1(a) above. There shall be three arbitrators: each party shall choose one arbitrator and, if the two arbitrators are not able to agree on a third arbitrator, the third shall be chosen by the ICC.  The prevailing party in the arbitration shall have the right to recover its costs and reasonable attorneys' fees, which the arbitrators shall include in their awards.  Any party that seeks to confirm or vacate an arbitration award issued under this Section 5.1(b) may do so only pursuant to the applicable arbitration statutes.  In any litigation involving ICANN concerning

this Agreement, jurisdiction and exclusive venue for such litigation shall be in a court located in Los Angeles County, California, USA; however, the parties shall also have the right to enforce a judgment of such a court in any court of competent jurisdiction. For the purpose of aiding the arbitration and/or preserving the rights of the parties during the pendency of an arbitration, the parties shall have the right to seek a temporary stay or injunctive relief from the arbitration panel or a court, which shall not be a waiver of this agreement to arbitrate.

Section 5.2      <u>Specific Performance</u>. Registry Operator and ICANN agree that irreparable damage could occur if any of the provisions of this Agreement was not performed in accordance with its specific terms. Accordingly, the parties agree that they each shall be entitled to seek from the arbitrators specific performance of the terms of this Agreement (in addition to any other remedy to which each party is entitled).

Section 5.3      <u>Limitation of Liability</u>. ICANN's aggregate monetary liability for violations of this Agreement shall not exceed the amount of Registry-Level Fees paid by Registry Operator to ICANN within the preceding twelve-month period pursuant to Section 7.2 of this Agreement. Registry Operator's aggregate monetary liability to ICANN for violations of this Agreement shall be limited to fees and monetary sanctions due and owing to ICANN under this Agreement. In no event shall either party be liable for special, indirect, incidental, punitive, exemplary, or consequential damages arising out of or in connection with this Agreement or the performance or nonperformance of obligations undertaken in this Agreement, except as provided pursuant to Section 4.3 of this Agreement. EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT, REGISTRY OPERATOR DOES NOT MAKE ANY WARRANTY, EXPRESS OR IMPLIED, WITH RESPECT TO THE SERVICES RENDERED BY ITSELF, ITS SERVANTS, OR ITS AGENTS OR THE RESULTS OBTAINED FROM THEIR WORK, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY, NON-INFRINGEMENT, OR FITNESS FOR A PARTICULAR PURPOSE.

## ARTICLE VI  Termination Provisions

Section 6.1      <u>Termination by ICANN</u>. ICANN may terminate this Agreement if and only if: (i) Registry Operator fails to cure any fundamental and material breach of Registry Operator's obligations set forth in Sections 3.1(a), (b), (d) or (e); Section 5.2 or Section 7.3 within thirty calendar days after ICANN gives Registry Operator written notice of the breach, which notice shall include with specificity the details of the alleged breach; and (ii) (a) an arbitrator or court has finally determined that Registry Operator is, or was, in fundamental and material breach and failed to cure such breach within the prescribed time period and (b) following the decision of such arbitrator or court, Registry Operator has failed to comply with the decision of the arbitrator or court.

Section 6.2      <u>Bankruptcy</u>. This Agreement shall automatically terminate in the event Registry Operator shall voluntarily or involuntarily be subject to bankruptcy proceedings.

Section 6.3      <u>Transition of Registry upon Termination of Agreement</u>. Upon any termination of this Agreement as provided in Sections 6.1 and 6.2, the parties agree to work cooperatively to facilitate and implement the transition of the registry for the TLD in accordance with this Section 6.4. Registry Operator shall agree to provide ICANN or any successor registry authority that may be designated for the TLD with any data regarding operations of the registry for the TLD necessary to maintain operations that may be reasonably requested in addition to that data escrowed in accordance with Section 3.1(c)(i)

hereof.

Section 6.4    <u>Rights in Data</u>. Registry Operator shall not be entitled to claim any intellectual property rights in Registry Data. In the event that Registry Data is released from escrow as set forth in Section 3.1(c)(i), rights, if any, held by Registry Operator in the data shall automatically be licensed on a non-exclusive, irrevocable, royalty-free, paid-up basis to ICANN or to a party designated in writing by ICANN.

Section 6.5    <u>No Reimbursement</u>.  Any and all expenditures, capital investments or other investments made by Registry Operator in connection with this Agreement shall be at Registry Operator's own risk and ICANN shall have no obligation to reimburse Registry Operator for any such expense, capital expenditure or investment. Registry Operator shall not be required to make any payments to a successor registry operator by reason of registry fees paid to Registry Operator prior to the effective date of (i) any termination or expiration of this Agreement or (ii) transition of the registry, unless any delay in transition of the registry to a successor operator shall be due to the actions of Registry Operator.

### ARTICLE VII  Special Provisions

Section 7.1    <u>Registry-Registrar Agreement</u>.

(a)    <u>Access to Registry Services</u>.  Registry Operator shall make access to Registry Services, including the shared registration system, available to all ICANN-accredited registrars, subject to the terms of the Registry-Registrar Agreement attached as Appendix 8 hereto.  Registry Operator shall provide all ICANN-accredited registrars following execution of the Registry-Registrar Agreement, provided registrars are in compliance with such agreement, operational access to Registry Services, including the shared registration system for the TLD.  Such nondiscriminatory access shall include without limitation the following:

(i)    All registrars (including any registrar affiliated with Registry Operator) can connect to the shared registration system gateway for the TLD via the Internet by utilizing the same maximum number of IP addresses and SSL certificate authentication;

(ii)    Registry Operator has made the current version of the registrar toolkit software accessible to all registrars and has made any updates available to all registrars on the same schedule;

(iii)    All registrars have the same level of access to customer support personnel via telephone, e-mail and Registry Operator's website;

(iv)    All registrars have the same level of access to registry resources to resolve registry/registrar or registrar/registrar disputes and technical and/or administrative customer service issues;

(v)    All registrars have the same level of access to data generated by Registry Operator to reconcile their registration activities from Registry Operator's Web and ftp servers;

(vi)    All registrars may perform basic automated registrar

account management functions using the same registrar tool made available to all registrars by Registry Operator; and

(vii)      The shared registration system does not include, for purposes of providing discriminatory access, any algorithms or protocols that differentiate among registrars with respect to functionality, including database access, system priorities and overall performance.

Such Registry-Registrar Agreement may be revised by Registry Operator from time to time, provided however, that any such revisions must be approved in advance by ICANN.

(b)      <u>Registry Operator Shall Not Act as Own Registrar</u>.  Registry Operator shall not act as a registrar with respect to the TLD. This shall not preclude Registry Operator from registering names within the TLD to itself through a request made to an ICANN-accredited registrar.

(c)      <u>Restrictions on Acquisition of Ownership or Controlling Interest in Registrar</u>.  Registry Operator shall not acquire, directly or indirectly, control of, or a greater than fifteen percent ownership interest in, any ICANN-accredited registrar.

Section 7.2      <u>Fees to be Paid to ICANN</u>.

(a)      <u>Initial Fees</u>.  On the Effective Date, Registry Operator shall make  a one-time lump sum payment of US$625,000 to an account designated by ICANN. The uses of these initial fees shall include meeting the costs associated with establishing structures to implement the provisions of this Agreement.

(b)      <u>Fixed Registry-Level Fee</u>.  Registry Operator shall pay ICANN, to an account designated by ICANN, a Fixed Registry-Level Fee as provided below. Payments shall be made as follows: Beginning 1 July 2006 through 31 December 2006, Registry Operator shall begin prepayment of the 2007 Fixed Registry-Level Fee in equal monthly payments such that the total payments per quarter is US$1,500,000.  Beginning 1 January 2007, equal monthly payments for quarters ended 31 March 2007 and 30 June 2007 shall be paid such that the total payments per quarter, calculated net of the prepayments during the quarters ended 30 September 2006 and 31 December 2006, is US$1,500,000.  Beginning 1 July 2007, equal monthly payments for quarters ended 30 September 2007, 31 December 2007, 31 March 2008, and 30 June 2008, shall be paid such that the total payments per quarter is US$2,000,000.  Beginning 1 July 2008, equal monthly payments will increase such that the total payments per quarter will equal US$3,000,000.  Equal monthly payments shall continue such that the total payment per quarter will equal US$3,000,000 except that after 1 July 2009: (i) if the total number of annual domain name registrations increases by a total of ten million over the total number of domain name registrations on the Effective Date of the Agreement, the equal monthly payments shall increase by an amount totaling $750,000 per quarter, for each quarter that the increased level of annual domain name registrations is maintained; (ii)  if the total number of annual domain name registrations increases by a total of twenty million over the total number of domain name registrations at the time of the Effective Date of the Agreement, the equal monthly payments shall increase by an amount in addition to that set forth in

7.2(a)(i), totaling $750,000 per quarter, for each quarter that the increased level of annual domain name registrations is maintained; provided, however, if at any time after the Effective Date, the total number of annual domain name registrations falls below the total number of domain name registrations on the Effective Date of the Agreement, or, if applicable, the total number of annual domain name registrations in 7.2(a)(i) and 7.2(a)(ii) above, the equal monthly payments shall be reduced by US$25,000 per month for every 1 million annual domain name registrations reduction.

(c)        Variable Registry-Level Fee.  For fiscal quarters in which ICANN does not collect a variable accreditation fee from all registrars, upon receipt of written notice from ICANN, Registry Operator shall pay ICANN a Variable Registry-Level Fee. The fee will be calculated by ICANN.  The Registry Operator shall invoice and collect the fees from the registrars who are party to a Registry-Registrar Agreement with Registry Operator and paid to ICANN by the Registry Operator by the 20th day following the end of each calendar quarter (i.e., on April 20, July 20, October 20 and January 20 for the calendar quarters ending March 31, June 30, September 30 and December 31) of the year to an account designated by ICANN. The fee will consist of two components; each component will be calculated by ICANN for each registrar:

>   (i)          The transactional component of the Variable Registry-Level Fee shall be specified by ICANN in accordance with the budget adopted by the ICANN Board of Directors for each fiscal year but shall not exceed US$0.25.

>   (ii)          The per-registrar component of the Variable Registry-Level Fee shall be specified by ICANN in accordance with the budget adopted by the ICANN Board of Directors for each fiscal year, but the sum of the per-registrar fees calculated for all registrars shall not exceed the total Per-Registrar Variable funding established pursuant to the approved 2004-2005 ICANN Budget.

(d)        Interest on Late Payments.  For any payments ten days or more overdue, Registry Operator shall pay interest on late payments at the rate of 1.5% per month or, if less, the maximum rate permitted by applicable law.

Section 7.3        Pricing for Domain Name Registrations and Registry Services.

(a)          Scope.  The Registry Services to which the provisions of this Section 7.3 shall apply are:

>   (i)          the Registry Services defined in Section 3.1(d)(iii)(a), above, and

>   (ii)          other products or services that the Registry Operator is required to provide within the scope of Section 3.1(d)(iii)(b), above, because of the establishment of a Consensus Policy (as defined in Section 3.1(b) above):

>>   (1)        to implement changes in the core functional or performance specifications for Registry Services (as defined in Section 3.1(d)(iii)(a)); or

(2)    that are reasonably necessary to facilitate:  (A) Security and/or Stability of the Internet or DNS; (B) Security and Stability of the registry database for the TLD; or (C) resolution of disputes regarding the registration of domain names (as opposed to the use of such domain names).

Nothing contained herein shall be construed to apply the provisions of this Section 7.3 to the services enumerated in Appendix 9 of this Agreement.

(b)    No Tying.  Registry Operator shall not require, as a condition of the provision or use of Registry Services subject to this Section 7.3 in accordance with the requirements of this Agreement, including without limitation Section 7.1 and Appendix 10, that the purchaser of such services purchase any other product or service or refrain from purchasing any other product or service.  Notwithstanding any other offering that may include all or any portion of the Registry Services at any price, Registry Operator shall offer to all ICANN-accredited registrars the combination of all Registry Services subject to this Section 7.3 at a total price for those Registry Services that is no greater than the Maximum Price calculated pursuant to Section 7.3(d) and that otherwise complies with all the requirements of Section 7.3.

(c)    Price for Registry Services.  The price for all Registry Services subject to this Paragraph 7.3 shall be the amount, not to exceed the Maximum Price, that Registry Operator charges for each annual increment of a new and renewal domain name registration and for each transfer of a domain name registration from one ICANN-accredited registrar to another.

(d)    Maximum Price.  The Maximum Price for Registry Services subject to this Paragraph 7.3 shall be as follows:

(i)    from the Effective Date through 31 December 2006, US$6.00;

(ii)    for each calendar year beginning with 1 January 2007, the smaller of the preceding year's Maximum Price or the highest price charged during the preceding year, multiplied by 1.07; provided, however, that such increases shall only be permitted in four years of any six year term of the Agreement.  In any year, however, where a price increase does not occur, Registry Operator shall be entitled to increase the Maximum Price by an amount sufficient to cover any additional incremental costs incurred during the term of the Agreement due to the imposition of any new Consensus Policy or documented extraordinary expense resulting from an attack or threat of attack on the Security or Stability of the DNS, not to exceed the smaller of the preceding year's Maximum Price or the highest price charged during the preceding year, multiplied by 1.07.

(e)    No price discrimination.  Registry Operator shall charge the same price for Registry Services subject to this Section 7.3, not to exceed the Maximum Price, to all ICANN-accredited registrars (provided that volume discounts and marketing support and incentive programs may be made if the same opportunities to qualify for those discounts and marketing support and incentive programs is available to

all ICANN-accredited registrars).

(f)    Adjustments to Pricing for Domain Name Registrations.  Registry Operator shall provide no less than six months prior notice in advance of any increase for new and renewal domain name registrations and for transferring a domain name registration from one ICANN-accredited registrar to another and shall continue to offer for periods of up to ten years new and renewal domain name registrations fixed at the price in effect at the time such offer is accepted.  Registry Operator is not required to give notice of the imposition of the Variable Registry-Level Fee set forth in Section 7.2(c).

(g)    Maximum Price does not include ICANN Variable Registry-Level Fee.  The Maximum Price does not include, and shall not be calculated from a price that includes, all or any part of the ICANN Variable Registry-Level Fee set forth in Section 7.2(c), above, or any other per-name fee for new and renewal domain name registrations and for transferring a domain name registration from one ICANN-accredited registrar to another.

## ARTICLE VIII   Miscellaneous

Section 8.1    No Offset.  All payments due under this Agreement shall be made in a timely manner throughout the term of this Agreement and notwithstanding the pendency of any dispute (monetary or otherwise) between Registry Operator and ICANN.

Section 8.2    Use of ICANN Name and Logo.  ICANN grants to Registry Operator a non-exclusive royalty-free license to state that it is designated by ICANN as the Registry Operator for the Registry TLD and to use a logo specified by ICANN to signify that Registry Operator is an ICANN-designated registry authority. This license may not be assigned or sublicensed by Registry Operator.

Section 8.3    Assignment and Subcontracting.  Any assignment of this Agreement shall be effective only upon written agreement by the assignee with the other party to assume the assigning party's obligations under this Agreement. Moreover, neither party may assign this Agreement without the prior written approval of the other party. Notwithstanding the foregoing, ICANN may assign this Agreement (i) in conjunction with a reorganization or re-incorporation of ICANN, to another nonprofit corporation organized for the same or substantially the same purposes, or (ii) as may be required pursuant to the terms of that certain Memorandum of Understanding between ICANN and the U.S. Department of Commerce, as the same may be amended from time to time.  Registry Operator must provide notice to ICANN of any subcontracting arrangements, and any agreement to subcontract portions of the operations of the TLD must mandate compliance with all covenants, obligations and agreements by Registry Operator hereunder.  Any subcontracting of technical operations shall provide that the subcontracted entity become party to the data escrow agreement mandated by Section 3.1(c)(i) hereof.

Section 8.4    Amendments and Waivers.  No amendment, supplement, or modification of this Agreement or any provision hereof shall be binding unless executed in writing by both parties. No waiver of any provision of this Agreement shall be binding unless evidenced by a writing signed by the party waiving compliance with such provision. No waiver of any of the provisions of this Agreement or failure to enforce any of the provisions hereof shall be deemed or shall constitute a waiver of any other provision hereof, nor shall any such waiver constitute a continuing waiver unless otherwise expressly provided.

Section 8.5     <u>No Third-Party Beneficiaries</u>.  This Agreement shall not be construed to create any obligation by either ICANN or Registry Operator to any non-party to this Agreement, including any registrar or registered name holder.

Section 8.6     <u>Notices, Designations, and Specifications</u>.  All notices to be given under or in relation to this Agreement shall be given either (i) in writing at the address of the appropriate party as set forth below or (ii) via facsimile or electronic mail as provided below, unless that party has given a notice of change of postal or email address, or facsimile number, as provided in this agreement. Any change in the contact information for notice below shall be given by the party within 30 days of such change.  Any notice required by this Agreement shall be deemed to have been properly given (i) if in paper form, when delivered in person or via courier service with confirmation of receipt or (ii) if via facsimile or by electronic mail, upon confirmation of receipt by the recipient's facsimile machine or email server.  Whenever this Agreement shall specify a URL address for certain information, Registry Operator shall be deemed to have been given notice of any such information when electronically posted at the designated URL.  In the event other means of notice shall become practically achievable, such as notice via a secure website, the parties shall work together to implement such notice means under this Agreement.

If to ICANN, addressed to:

Internet Corporation for Assigned Names and Numbers
4676 Admiralty Way, Suite 330
Marina Del Rey, California 90292
Telephone: 1-310-823-9358
Facsimile: 1-310-823-8649
Attention: President and CEO
With a Required Copy to:  General Counsel
Email:  (As specified from time to time.)

If to Registry Operator, addressed to:

VeriSign, Inc.
21355 Ridgetop Circle
Dulles, VA  20166
Telephone: 1-703-948-4463
Facsimile: 1-703-450-7326
Attention: VP, Associate General Counsel, VNDS
With a Required Copy to:  General Counsel
Email: (As specified from time to time.)

Section 8.7     <u>Language</u>.  Notices, designations, determinations, and specifications made under this Agreement shall be in the English language.

Section 8.8     <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

Section 8.9     <u>Entire Agreement</u>.  This Agreement (including its Appendices, which form a part of it) constitutes the entire agreement of the parties hereto pertaining to the operation of the TLD and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, between the parties on that subject. In the event of a conflict between

Case 3:07-cv-06456-MHP      Document 20-2      Filed 05/30/2008      Page 30 of 34

the provisions in the body of this Agreement and any provision in its Appendices, the provisions in the body of the Agreement shall control.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized representatives.

### INTERNET CORPORATION FOR ASSIGNED NAMES AND NUMBERS

By:_____

       Paul Twomey
       President and CEO

Date: 1 March 2006

### VeriSign, Inc.

By:_____

       Stratton Sclavos
       President and CEO, VeriSign, Inc.

Date: 1 March 2006

---

Comments concerning the layout, construction and functionality of this site should be sent to webmaster@icann.org.

Page updated 9-Mar-2006

(c) 2007  The Internet Corporation for Assigned Names and Numbers. All rights reserved.

Exhibit D



**DISCLAIMER:** The information displayed here is current as of MAY 02, 2008 and is updated weekly. It is not a complete or certified record of the Corporation.

| Corporation | | |
|---|---|---|
| VERISIGN, INC. | | |
| **Number:** C1933410 | **Date Filed:** 4/26/1995 | **Status:** active |
| **Jurisdiction:** DELAWARE | | |
| **Address** | | |
| 487 EAST MIDDLEFIELD ROAD | | |
| MOUNTAIN VIEW, CA 94043 | | |
| **Agent for Service of Process** | | |
| C T CORPORATION SYSTEM | | |
| 818 WEST SEVENTH ST | | |
| LOS ANGELES, CA 90017 | | |

Blank fields indicate the information is not contained in the computer file.

If the status of the corporation is "Surrender", the agent for service of process is automatically revoked. Please refer to California Corporations Code Section 2114 for information relating to service upon corporations that have surrendered.

Exhibit E



US Home  |  Worldwide Sites  |  Contact Us  |  Site Map

| Products & Services | Solutions | Support | About VeriSign | Existing Customers |

[Search]

You Are Here: US Home > About VeriSign > Contact Us

## About VeriSign

### Contact VeriSign, Inc.

VeriSign (Nasdaq: VRSN) is the trusted provider of Internet infrastructure services for the digital world. Billions of times each day, companies and consumers rely on our Internet infrastructure to communicate and conduct commerce with confidence.

**Contact Us**
**Contact VeriSign**
**Worldwide Headquarters at 650-961-7500**

**Learn More**
Investor Relations
News & Events
Government Relations
Careers
Contact Us

**On this page:**

- Product Sales
- Customer Support
- Billing Inquiries
- Regional Offices
- International Offices
- Employment
- Analyst Relations
- Government Relations
- Investor Relations
- Permissions

**Related Links**
Executive Briefing Center
Fact Sheet
Press Releases
Upcoming Events
VeriSign Corporate Brochure

### Product Sales

**SSL Certificates**
Phone: 650-426-5112 or 866-893-6565
Submit inquiry online

**SSL Renewals**
Phone: 866-893-6565 - option 2
or 650-426-3347
E-mail: renewals-team@verisign.com

**SSL Channel Sales / ISP SSL Sales**
650-426-5106
E-mail: channel-partners@verisign.com

**Managed PKI for SSL**
**Multiple Server Certificates**
Phone: 650-426-5115
E-mail: verisales@verisign.com

**Managed PKI**
Phone: 650-426-5310
Submit inquiry online

**Managed PKI/Adobe Certified**
**Document Services**
Phone: 650-426-5310
Submit inquiry online

**MSS-Managed Security Services**
Phone: 650-426-5310
Submit inquiry online

**Global Security Consulting**
Consulting Services
Phone: 650-426-5310
Submit inquiry online

**Anti-Phishing Solution**
Phone: 650-426-5310
Submit inquiry online

**VeriSign Supply Chain Services**
E-mail: info@incodewireless.com

**DNS Assurance Services**
If you have questions about your existing account or the Brand Manager, call toll-free 1-866-907-DBMS (1-866-907-3267; outside the US, +1-650-426-3267)

**Digital Brand Management Services**
If you have questions about your existing account or the Brand Manager, call toll-free 1-866-907-DBMS (1-866-907-3267; outside the US, +1-650-426-3267)

**VeriSign Communications Services**
Phone: 650-426-5310
Submit inquiry online

### Billing Inquiries

**For SSL, MPKI or MSS Products**
E-mail: billing@verisign.com

### Regional Offices

**VeriSign Worldwide Headquarters**
487 East Middlefield Road
Mountain View, CA 94043
Phone: 650-961-7500
Fax: 650-961-7300

**California**
487 East Middlefield Road
Mountain View, CA 94043
Phone: 650-961-7500
Fax: 650-961-7300

**Massachusetts**
311 Arsenal Street
Watertown, MA 02472
Phone: 617-673-2400
Fax: 617-673-2401

**New York**
3 East 54th Street
Suite 1100
New York, NY 10022
Phone: 917-322-3600